## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

**JOHN DOE,**

       **Plaintiff,**

  **v.**                              **Case No.**

**COLUMBIA UNIVERSITY,**

       **Defendant.**

---

### COMPLAINT AND JURY DEMAND

---

Plaintiff John Doe, by his attorneys Nesenoff & Miltenberg, LLP and the Law Offices of Jeffrey Lichtman, as and for his complaint against Defendant Columbia University ("Columbia" or the "University"), respectfully alleges as follows:

### <u>THE NATURE OF THE ACTION</u>

1.    This action arises out of the egregious miscarriage of justice against Plaintiff, a Jewish student at Columbia University and former Israeli Defense Forces soldier, through the University's biased misconduct proceedings, which rushed to silence Plaintiff and brand him as a criminal for harmlessly exercising his freedom of expression in opposition to a pro-Hamas pro-Palestine rally, while turning a blind eye and refusing to take action against the rally organizers, who have called for violence and destruction of an entire legal state, have called for the genocide of the Jewish people generally, and have specifically threatened Jewish students on Columbia's campus.

2.    In light of the extreme surge in acts of antisemitism across the country since the horrific October 7, 2023 attack committed by the Hamas against Israel—which included the

murder, rape, and kidnapping of thousands of Israeli citizens—student organizations have continued to hold unsanctioned pro-Hamas pro-Palestine rallies on Columbia's campus, in violation of the University's policies. However, Columbia has turned a blind eye and has allowed these rallies to continue, and has refused to implement any policy violations against the rally organizers.

3.      On January 17, 2024, Plaintiff attended one of the unsanctioned pro-Hamas pro-Palestine rallies on campus, and, as a harmless expression of his speech, he sprayed into the air a novelty, non-toxic "fart" spray named "Liquid Ass" and "Wet Farts" which he purchased on Amazon for $26.11.



4.      Almost instantly, the University rushed to silence Plaintiff, placed him on interim suspension from the University, and published a statement to the University community which accused Plaintiff of a hate crime and placed Plaintiff's safety in grave jeopardy.

5.      When Plaintiff sought help from the University due to the antisemitic death threats that he had been receiving, the University remained silent. As a result, Plaintiff was forced to leave his apartment and had to cover his face anytime he went outside in fear of his safety.

6.      In contrast, when asked about the unsanctioned pro-Hamas pro-Palestine rally, a University spokesperson merely stated, "The University continues to support students who wish to express themselves through speech."

7.      Indeed, from inception, Columbia's investigation and adjudication process was flawed, biased, and deficient. Throughout the university misconduct process, Plaintiff was subject to unfair and discriminatory treatment. Plaintiff was presumed guilty from the start, due to his affiliation with Israel, while the other non-Israeli students who attended the protest were not disciplined in any manner.

8.     As a result of Columbia's flawed and biased investigation and adjudication process, Plaintiff was found responsible for disruptive behavior, harassment, and endangerment, and sanctioned to suspension from the University, forever marring his educational file with an improper finding of responsibility.

9.     By employing discriminatory, biased, and pre-determined presumptions of Plaintiff's guilt from the outset due to his affiliation with Israel, and by imposing an unreasonable sanction, Defendant displayed discrimination on the basis of Plaintiff's national origin in violation of Title VI of the Civil Rights Act of 1964, as well as New York state law.

10.    By violating its own policies and depriving Plaintiff of a fair and impartial disciplinary process, Defendant breached express and implied agreements with Plaintiff and acted in bad faith to fulfill its promises to him as an enrolled student at Columbia.

11.    Columbia University's silence against, and implicit support of, antisemitic protests and actions has put Jewish students, including Plaintiff, in a position of isolation, and has deprived Plaintiff and other Jewish students from full participation in educational opportunities at Columbia.

12.    Accordingly, Plaintiff brings this action against Defendant Columbia University for (i) violation of Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d *et seq.*; (ii) violation of New York Executive Law § 296 *et seq.*; (iii) violation of New York Civil Rights Law § 40, *et seq.*; (iv) violation of N.Y.C. Administrative Code § 8-107; and (v) breach of contract.

## THE PARTIES

13.     Plaintiff is a natural person and citizen of the United States and Israel. He is a Jewish Hispanic immigrant who, during the events described herein, was enrolled as a fulltime, tuition-paying, student at Columbia University.

14.     Defendant Columbia University is a partially federally funded private university located in New York, New York where it maintains its principal offices and place of business.

## JURISDICTION AND VENUE

15.     This Court has federal question, diversity and supplemental jurisdiction pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1332 and 28 U.S.C. § 1367 because: (i) the federal law claims arise under the constitution and statutes of the United States; (ii) Plaintiff and Defendant are citizens of different states and the amount in controversy exceeds $75,000; and (iii) the state law claims are so closely related to the federal law claims as to form the same case controversy under Article III of the United States Constitution.

16.     This Court has personal jurisdiction over Defendant Columbia on the ground that it is conducting business within the State of New York.

17.     Venue for this action properly lies in this district pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claim occurred in this judicial district.

<u>**FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS**</u>

**I.**   **BACKGROUND**

**A. Columbia University's Blatant Disregard for Acts of Antisemitism on Campus**

18.     For decades, Columbia University has turned a blind eye to growing antisemitism on campus, which has created both a hostile environment for Jewish and/or Israeli students and a fertile breeding ground for the antisemitic events alleged herein.

19.     Columbia first made headlines for antisemitic incidents in twenty years ago, in 2004, when the 40-minute film *Columbia Unbecoming* was first screened. The film was comprised of testimony from fourteen students describing antisemitic behavior witnessed and experienced on campus, including, but not limited to:

> One student, an Israeli and a former soldier, says a professor named Joseph Massad demanded to know how many Palestinians he'd killed; another woman recounts how George Saliba, one of the country's foremost scholars on Islamic sciences, told her she had no claim to the land of Israel, because—unlike him—she had green eyes, and therefore was 'not a Semite.'

*See* Jennifer Senior, *Columbia's Own Middle East War*, New York Magazine (Jan. 19, 2005), available at https://nymag.com/nymetro/urban/education/features/10868/; *see also* John Fund, *High Bias*, Wall Street Journal (Nov. 22, 2004), available at https://www.wsj.com/articles/SB122487860271467459

20.     In response to the film, then-president Lee Bollinger expressed his concern in making a comment, and standing up for Jewish students, in fear of "chilling speech" and protecting "academic freedom." *Id.* As a result, nearly no action was taken by Columbia to denounce antisemitism.

21.     Indeed, Columbia University, after interviewing multiple students, found that Professor Massad's statements detailed in the film had "exceeded commonly accepted bounds." In the same breath, however, Columbia stated, "Outside the classroom, there can be little doubt of Professor Massad's dedication to, and respectful attitude towards, his students whatever their

confessional or ethnic background or their political outlook. He made himself available to them in office hours and afterwards." *See Ad Hoc Grievance Committee Report, COLUMBIA NEWS (Mar. 28, 2005),*

*https://web.archive.org/web/20060209184005/http://www.columbia.edu/cu/news/05/03/ad_hoc_ grievance_committee_report.html*

22.    Further, Columbia even went on to grant tenure to Massad in 2009, prompting fourteen professors to protest irregularities and University policy violations in the tenure process. *See* Alix Pianin, *Professors protest Massad's tenure,* Columbia Spectator (Sep. 22, 2009), available at https://www.columbiaspectator.com/2009/09/22/professors-protest-massads-tenure/.

23.    In 2016, demonstrating the little to no growth Columbia exhibited with regard to supporting Jewish students, Columbia was publicly ranked at the top of the list for worst colleges for Jewish students throughout the United States and Canada. *See The 40 Worst Colleges for Jewish Students, 2016*, the Algemeiner (2016), available at https://www.algemeiner.com/list/the-40-worst-colleges-for-jewish-students-2016/columbia-university/.

24.    The article detailed that pro-Israel students reported feeling "very isolated" on campus. Further, the report stated, "There is a growing coalition of student groups and faculty members at the school voicing support for the BDS movement, and a regular Israel Apartheid Week, led by Students for Justice in Palestine, is held. This year, when Students Supporting Israel decided to respond to SJP with a demonstration of its own, *the student government forced it to roll back its reaction*." *Id.* (emphasis added).

25.    In 2019, Alums for Campus Fairness released a 33-page dossier of antisemitism at Columbia. *See* Alums for Campus Fairness, *A Hotbed For Hate: A Comprehensive Dossier of Antisemitism at Columbia University and Barnard College Since the 2016-2017 Academic Year*

(Oct. 20, 2019), available at https://campusfairness.org/wp-content/uploads/2019/10/dossier-1.pdf.

26.     The dossier states, among other things, that Columbia University and its sister school, Barnard College, "are arguably the most prominent settings for university-based antisemitism in the United States." *Id.*

27.     By way of example, and not limitation, the dossier highlights:

1) Antisemitic Expression - Language, imagery or behavior deemed antisemitic by the guidelines outlined in the U.S. State Department definition of antisemitism. Recent examples include:

- The May 2019 Students for Justice in Palestine (SJP) "die-in" on campus, at which a student speaker read a statement that condoned terrorism, denied Jewish self-determination, and demonized and delegitimized Israel.
- The April 2019 "Israeli Apartheid Week," during which SJP erected a mock "apartheid wall" on campus, with one wall panel stating, "End Israeli Apartheid" in large letters and another calling for "return," insinuating the elimination of the only Jewish state.
- The Center for Palestine Studies, which held an event in March 2019 with a title and description that accused Israel of "apartheid."

2) Targeting Jewish Students and Staff - Incidents that directly target Jewish and Zionist students on campus, or other Jewish members of the campus community, with harmful or hateful action based on their Judaism or perceived support for Israel. Recent examples include:

- SJP's April 2019 statement to the campus community that urged the community to ostracize Zionist and pro-Israel student groups, including Students Supporting Israel (SSI), by asking the campus "to reject racism, reject Zionism."
- SJP's February 2019 denigration of Hillel's Birthright Program, including a statement on Valentine's Day that "there's nothing romantic about a propaganda trip on occupied land!"
- The November 2018 incident when a Jewish professor's office was vandalized with swastikas and the antisemitic term "Yid" found spraypainted in red in the entryway to the office.

3) BDS Activity – Incidents tied to the BDS movement that are antisemitic in intent, content, expression, and effect. Recent examples include:

- The March 2019 proposal on whether to hold a campus-wide referendum on divestment from Israel, which was debated in the Student Council for four hours and ultimately failed in a secret ballot.
- The April 2018 Barnard's Student Government Association (SGA) letter urging administrators to divest from eight companies with ties to Israel.
- The Columbia University Apartheid Divest's March 2018 event, titled "WTF is BDS?!" *Id.*

28. In other words, given Columbia's history of antisemitic acts on campus, Columbia University had every reason to expect that the horrifying October 7, 2023 Hamas attack—the murder, rape, kidnapping, and torturing of more than 1,000 Israeli men, women, and children—and Israel's inevitable response, would trigger further antisemitic acts at Columbia University that would place Jewish students further isolated and at risk.

29. Columbia University should have condemned the acts of terrorism perpetuated by the Hamas on October 7, 2023 by denouncing those events quickly and publicly, and by expressing support for the University's Jewish and Israeli students, just as Columbia had demonstrated public support for other victimized groups in the past.

30. For example, on June 1, 2020, following the death of George Floyd,  then-president Bollinger released a statement addressing the "horrifying ending of the life of George Floyd, a citizen in the very system of justice intended to protect him, and us, which then, along with other recent tragic deaths," and the "centuries of invidious discrimination against African Americans." *See Message from President Lee C. Bollinger*, Columbia University (Jun. 1, 2020), available at https://president.columbia.edu/news/message-president-lee-c-bollinger.

31. On June 3, 2020, leaders of Columbia mirrored Bollinger's statement, addressing the "inexcusable actions that killed George Floyd, as well as other recent deaths and racially motivated events," and calling for, among other things, to "stand in solidarity with the Black community and speak out against unjust and inhumane incidents of violence," and "employ anti-

racist and unconscious bias training and engage in interracial dialogues that will dispel the misrepresentations that dehumanize our Black community members and other marginalized groups." *See Columbia University Leadership Responds to the Death of George Floyd*, Columbia University (Jun 3, 2020), available at https://neighbors.columbia.edu/news/columbia-university-leadership-responds-death-george-floyd.

32.     On July 21, 2020, in follow up to the statements of Columbia's leadership, the University released *Columbia's Commitment to Antiracism*, which outlined the University's steps and progress toward supporting Black students on campus and eliminating acts of racism. *See Columbia's Commitment to Antiracism*, Columbia University (Jul. 21, 2020), available at https://president.columbia.edu/news/columbias-commitment-antiracism.

33.     Likewise, in response to ICE regulations which would have forced international students to leave the country during COVID-19 and enroll only in online courses, the University swiftly released a statement in support of international students, stating, "Last week, I pledged to oppose restrictive immigration policies impeding the entry of international faculty, physicians, and research scholars into the U.S. Today, I repeat that pledge." The Letter went on to outline "three important courses of action" for the University. *See Response to Recently Announced ICE Restrictions*, Columbia University (Jul. 7, 2020), available at https://president.columbia.edu/news/response-recently-announced-ice-restrictions.

34.     On March 18, 2021, in light of the tragic hate crimes committed against Asian individuals, Bollinger released a statement decrying the acts, stating, "To the many thousands in our Columbia community who are Asian or Asian American, we want you to know that we, too, on your behalf and for all of us, feel the anguish and justifiable fear because of this latest episode of a deep-rooted strain of racism in America. The truth is there can be no equanimity for any of us

so long as violence born of bigotry and xenophobia is present in our lives." *See Columbia University Decries Asian Hate, Offers Support After Spate of Recent Attacks*, Columbia University (Mar. 18, 2021), available at https://news.columbia.edu/news/columbia-university-decries-asian-hate-offers-support-after-spate-recent-attacks#:~:text=%22Columbia%20Business%20School%20stands%20in,racism%20whenever%20we%20witness%20it.

35.     When Russia invaded Ukraine in 2022, Bollinger released a statement supporting Ukrainian and Russian students, stating:

> Dear fellow members of the Columbia community:
>
> Following my statement from this past Thursday, I write on the horrors of the Russian government's invasion of Ukraine and the unspeakable acts of criminal violence, brutality, and violations of international law the world is now witnessing.
>
> As hundreds of thousands of people are being forced from their homes, pouring into neighboring countries and nations across Europe, we, as an institution of learning, will expand the initiative we put in place for students and scholars displaced by the crisis in Afghanistan to include those seeking refuge from the war in Ukraine. We are eager to welcome these students and scholars to our campuses.
>
> We also stand ready to support all members of our community whose lives have been upended by this war, particularly our Ukrainian and Russian students who are facing a bewildering and uncertain road ahead. The Office of University Life and the International Students and Scholars Office are reaching out to everyone affected to offer whatever assistance we can. More to follow.

*See Message Regarding Ukraine*, Columbia University (Mar. 2, 2022), available at https://president.columbia.edu/news/message-regarding-ukraine.

36.     Columbia's support was patently different, however, when it came to the horrifying October 7 attack by the Hamas against Israel. Indeed, other colleges and universities swiftly released statements and action plans supporting Jewish and Israeli students. *see* Lexi Lonas, *University presidents unveil support for Israel after criticism*, The Hill (Oct. 17, 2023), available

at     https://thehill.com/homenews/education/4260554-university-presidents-support-israel-after-criticism/. However, Columbia remained silent.

37.     Columbia's initial silence regarding the October 7 attack was deafening. By not taking immediate action to decry the attack, as Columbia had done in the past with regard to other victimized groups, Columbia implicitly approved of the antisemitic violence occurring, and left Jewish and Israeli students feeling alone and unsupported.

38.     On October 9, 2023, Columbia's President, Minouche Shafik, finally released a public statement in response to the October 7 attack, but it lacked the specificity, tone of support, and call to action previously issued by Columbia with regard to other victimized groups.

39.     Indeed, the statement failed to address the outright murder, rape, and kidnapping of thousands of innocent Israeli people, and instead merely stated, "I was devastated by the horrific attack on Israel this weekend and the ensuing violence that is affecting so many people. Unfortunately, at this moment, little is certain except that the fighting and human suffering are not likely to end soon." *See Message of Concern for Our Community*, Columbia University (Oct. 9, 2023), available at https://president.columbia.edu/news/message-concern-our-community.

40.     Concerningly, not once did the statement offer direct support for Israeli or Jewish students.

41.     Further, unlike past statements that had offered a gameplan for how to reduce acts of hate moving forward, this statement merely said: "I strongly encourage Columbia faculty to find ways of bringing clarity and context to this painful moment, just as you contribute your expertise and scholarship to other great challenges of our time." *Id.*

42.     The statement further said: "our first priority has been to make sure everyone connected to Columbia is safe and to provide logistical support and other types of resources for students, staff, and faculty who are directly affected by the conflict." *Id.*

43.     The University's lackluster response to the brutal attack against Israel demonstrates Columbia's deliberate indifference toward the safety and rights of Jewish and Israeli students, including Plaintiff.

44.     Indeed, national news outlets widely reported that Columbia University failed to take action against the acts of antisemitism across campus following the October 7 attack. *See* Jack Morphet and Jesse O'Neill, *Jewish Columbia students slam university's 'inaction' against antisemitism: 'I don't feel safe'*, New York Post (Oct. 30, 2023), available at https://nypost.com/2023/10/30/metro/jewish-columbia-students-slam-universitys-inaction-against-antisemitism/.

45.     As detailed by the Committee on Education and the Workforce (the "Committee"), Columbia University experienced striking displays of antisemitism following the October 7 attack, including, but not limited to:

- An Israeli undergraduate who spoke in support of Israel at an October 10, 2023, rally subsequently received numerous harassing phone calls and texts, including messages saying "YOURE [sic] THE TERRORIST," and "[h]ad fun with those crocodile tears bitch?"

- In the early morning hours of October 11, 2023, an individual outside Columbia's main library began yelling "free Palestine!" at an Israeli undergraduate wearing a Star of David necklace. The individual told the undergraduate he was yelling "because you are a Jew" and pointed to the Star of David. According to multiple eyewitnesses, the individual then yelled "fuck the Jews" multiple times.

- On October 11, 2023, an Israeli Columbia student was beaten with a stick by a former Columbia undergraduate whom the victim had confronted about ripping down flyers of Israeli hostages. The assailant shouted, "Fuck you. Fuck all you prick crackers." 11 The perpetrator was prosecuted for multiple criminal charges, including second-degree and third-degree assault, both charged as hate crimes.

- At an October 12, 2023, anti-Israel protest by Columbia's chapters of SJP and JVP, students chanted "from the river to the sea" and held a "die-in."13 Following the rally, the crowd of protestors moved toward the university's Kraft Center for Jewish Life, causing the building to be locked down and Jewish students to shelter inside. During the protest, a Jewish student wearing an Israeli flag was yelled at and called a "murderer," while another Jewish student leaving the protest had an Israeli flag he was wearing torn off and thrown down a subway staircase.

- On October 19, 2023, a Columbia student yelled "fuck the Jews" at a Jewish law student wearing a yarmulke inside Columbia's law school building. The university reportedly identified the perpetrator but had not taken any action as of October 30.

- On October 19, 2023, Student Workers of Columbia – United Auto Workers Local 2710, which represents over 3,000 undergraduate and graduate student workers at Columbia, issued a statement saying, "we stand in solidarity with the Palestinian people" and "affirm their right to self-determination and freedom from apartheid."16 The statement condemned what it called "75 years of Israeli settlercolonial rule" and "dehumanizing, unsupported claims of Israeli victimhood."17 The union represents teaching assistants and instructors in positions of authority over Jewish and Israeli students.

- On October 20, 2023, the president of the student group LionLez sent an email promoting a screening of Black lesbian films with the message, "[i]t's FREE PALESTINE over here. Zionists aren't invited." 18 In an October 21, 2023, email reply to a student urging the group to remain neutral on the conflict, LionLez's president wrote, "white Jewish people are today and always have been the oppressors of all brown people," "WHEN I SAY THE HOLOCAUST WASN'T SPECIAL, I MEAN THAT," and "Israelites are the Nazis."19 The email was signed, "STOP THE GENOCIDE! FREE PALESTINE! FUCK ISRAEL."

- On October 24, 2023, an undergraduate veteran of the Israel Defense Forces was protesting on campus alongside other students holding a sign that said, "Columbia doesn't care about the safety and wellbeing of Jewish students." An individual walking by yelled "[f]uck Israel." When a student responded that the poster was about Jews, not Israel, the individual responded, "[f]uck the Jews."

- On October 27, 2023, a swastika was found drawn on a bathroom wall in Columbia's School of International and Public Affairs building.

- On November 9, 2023, a student shouted "fuck the Jews" at a Jewish student wearing a yarmulke in the kosher section of a campus dining hall.

- On January 23, 2024, Columbia Law School's Student Senate denied recognition to a proposed student organization called Law Students Against Antisemitism. According to the Columbia Spectator, nine organizations have requested

recognition this year, and Law Students Against Antisemitism has been the only one not to receive approval.

- On January 31, 2024, posters appeared across campus with an image of a blue and white skunk with a Star of David on its back and the captions "Beware! Skunk on Campus" and "brought to you in collaboration by Columbia University and the IOF [Israeli Occupation Forces].

*Foxx Letter to Columbia University*, Committee on Education and the Workforce (Feb. 12, 2024), available at https://edworkforce.house.gov/uploadedfiles/2-12-24_foxx_letter_to_columbia_university.pdf.

46.     Despite the gruesome and astonishing nature of the antisemitic acts above, as well as other acts further detailed in the Committee's Letter, Columbia has taken no steps to sanction or otherwise discourage acts of antisemitism on campus.

**B.  The Anti-Israel, Antisemitic Protests of January 19, 2024**

47.     On November 10, 2023, following numerous antisemitic and anti-Israel attacks on Columbia students in the aftermath of the October 7 attack, Columbia suspended its campus chapters of two anti-Israel groups, Students for Justice in Palestine ("SJP") and Jewish Voice for Peace ("JVP"). *See Statement From Gerald Rosberg, Chair of the Special Committee on Campus Safety*, Columbia University (Nov. 10, 2023), available at https://news.columbia.edu/news/statement-gerald-rosberg-chair-special-committee-campus-safety.

48.     Notably, the notice only stated that the suspension was due to violations of University policy by holding unauthorized events, and stated nothing about the antisemitic nature of the events. *Id.*

49.     However, SJP and JVP have continued to hold anti-Israel events on campus with no punishment. *See* Haley Cohen, *Suspended groups at Columbia University continue to hold anti-*

*Israel  campus  events*,  Jewish  Insider  (Dec.  11,  2023),  available  at https://jewishinsider.com/2023/12/columbia-university-anti-israel-protests-sjp-jvp/.

50.     On January 19, 2024, Columbia University Apartheid Divest, the Barnard-Columbia Abolition Collective, and Student-Worker Solidarity held a hate rally on Columbia's campus, where the groups chanted "Minouche Shafik, can't you see, we are all SJP, we are all JVP." *See Pro-Palestinian student groups hold 'divestment now' rally on Low Steps, call for tuition strike*, Columbia Spectator (Jan. 19, 2024), available at https://www.columbiaspectator.com/news/2024/01/19/pro-palestinian-student-groups-hold-divestment-now-rally-on-low-steps-call-for-tuition-strike/.

51.     Plaintiff, a senior at Columbia University and former Israeli Defense Forces soldier, attended the rally along with one of his friends.

52.     Prior to the rally, Plaintiff had purchased two "fart sprays" off Amazon called "Liquid Ass" and "Wet Farts." Both harmless gag gifts which can be purchased online for under $10.

53.     Plaintiff brought this spray along with him to the rally, to express his speech and thoughts regarding the pro-Hamas pro-Palestine, anti-Israel sentiment.

54.     Students at the rally shouted genocidal slogans such as "Intifada," "Jewish Genocide," "Glory to the Martyrs," "Expulsion of IOF students," and "From the river to the sea, Palestine will be Free."

55.     While at the rally, and during the chants of genocidal slogans, Plaintiff sprayed the odorous spray in the air—not directly at any individual.

56.     Plaintiff's actions were a harmless expression of speech to demonstrate discontent with the pro-Hamas pro-Palestine message through the use of a gag gift, and nothing further.

### C. Columbia University's Investigation

57.     Interestingly, in response to the pro-Hamas pro-Palestine protest, which the University recognized as an unauthorized event in violation of University policies, a University spokesperson merely stated that "The University continues to support students who wish to express themselves through speech." *Id.*

58.     On information and belief, the University has taken *no action* against pro-Palestine groups which have held unsanctioned events and have called for violence and the total destruction of an entire legal state.

59.     In contrast, on January 21, 2024, two days after Plaintiff's harmless expression of speech, Plaintiff received a notice from the University which placed Plaintiff on interim suspension, making him "ineligible to participate in any Columbia University classes and academic or extracurricular activities."

60.     The letter from the University further stated that Plaintiff had allegedly "engaged in disrupting and harassing behavior towards students" and that Plaintiff had "released a potentially harmful substance in a crowd during a protest."

61.     The University issued the interim suspension despite the fact that until this point, Plaintiff had been an upstanding student with an excellent GPA, and had never before been in any disciplinary trouble.

62.     Notwithstanding, the University took swift action to brand Plaintiff, by merely using a gag gift, such a danger to the campus community as to warrant an interim suspension and complete preclusion from educational activities.

63.     Further, no other pro-Palestine protestor or attendant of the unsanctioned rally was suspended or faced any disciplinary action.

64.     On January 22, 2024, Interim Provost Dennis Mitchell issued a community-wide email regarding Plaintiff, stating: "As some of you may be aware, a deeply troubling incident occurred on the steps of Low Library on Friday. Numerous Columbia and Barnard students who attended a protest later reported being sprayed with a foul-smelling substance that required students to seek medical treatment. After the Department of Public Safety received an initial complaint late Friday night, the University immediately initiated steps to investigate the incident, and has since been actively working with local and federal authorities. The New York City Police Department is taking the lead role in investigating what appear to have been **serious crimes, possibly hate crime**." (emphasis added).

65.     The assertion that students required medical treatment was made solely, on information and belief, to paint Plaintiff as dangerous. To date, there has been no medical or physical evidence to support the assertions of any of the students that claimed they were harmed and/or impacted by the spray. Indeed, the spray is harmless, non-toxic, and can be purchased by anyone on Amazon.[1]

66.     Upon information and belief, Students who claimed they were allegedly harmed by the spray created and promoted fundraising pages such as "Buy me a Coffee" whereupon they have received thousands of dollars in donations for their alleged "suffering."

---

[1] Further, as discovered during Plaintiff's University hearing, *all the students who filed the offense report refused counseling and psychological services at that time, and declined any medical evaluation*.

17

67.     In light of the University drawing attention to Plaintiff and branding him as a serious criminal, Plaintiff has been receiving death threats via social media, which have severely jeopardized his safety. Still, the University has shown no concern for Plaintiff's safety.

68.     Students have doxed Plaintiff on social media and also created fake FBI "wanted" posters with Plaintiff's face stating Plaintiff is "armed and dangerous," creating a hostile environment for Plaintiff and creating a grave safety risk if Plaintiff were to return to campus.

69.     Columbia has taken no actions in response to the doxing, contrary to its policies. *See Resources to Assist After Online Targeting/Doxing*, Columbia University, available at https://universitylife.columbia.edu/doxing-resources#:~:text=Targeting%2Fdoxing%20committed%20by%20University,in%20accordance%20with%20our%20policies.

70.     On January 25, 2024, Plaintiff sent an email to the University asking (i) to review his file prior to filing an appeal of the interim suspension; (ii) how to communicate with professors regarding missed classes due to the suspension; and (iii) for the University to take action with regard to the threats Plaintiff had been receiving in order to ensure his safety on campus.

71.     The University did not respond to Plaintiff's email. The threats that Plaintiff had been receiving forced Plaintiff to leave his apartment and distance himself from loved ones.

72.     On January 26, 2024, Plaintiff sent a follow up of his January 25, 2024 email.

73.     Plaintiff received a reply from the Office of Student Conduct, stating that Plaintiff must submit a form to review his file. Significantly, no response was given as to Plaintiff's safety concerns.

74.     On February 1, 2024, Plaintiff received an email from Dean Marin Andrade ("Dean Andrade") confirming she received Plaintiff's request for an appeal of the interim suspension, but

warned Plaintiff that any information he submitted to the University may be subpoenaed as there "is an ongoing investigation by law enforcement into the January 19, 2024, protest."

75.    On information and belief, this statement regarding law enforcement was made to intimidate Plaintiff and discourage him from participating in the University disciplinary process.

76.    On February 6, 2024, Dean Andrade denied Plaintiff's appeal of the interim suspension entirely, leaving Plaintiff completely precluded from continuing his education or otherwise having access to educational opportunities.

77.    On February 16, 2024, Plaintiff was given access to review the University's investigatory file regarding the alleged incident. Notably, there were no videos of the incident included in the file.

78.    On February 23, 2024, the University held a hearing in Plaintiff's matter. Jessica Nunez, Director of Student Conduct, and Vanessa Karahalios, Associate Dean of Records and Standards, served as the hearing officers.

79.    At the hearing, Plaintiff stated to the hearing officers that, at the advice of his counsel, Plaintiff would not be making a statement, and that the hearing officers should refer to his written statement.

80.    To Plaintiff's surprise, the hearing officers stated, for the first time, that there was "video evidence" of Plaintiff at the protest. As a result, Plaintiff was unable to properly prepare a defense to the allegations, as he was not permitted to review all available evidence against him.

81.    When Plaintiff stated that he never received any video evidence, the hearing officers shrugged it off, stating that it must have been a technological error.

82.    On March 7, 2024, Columbia established a new Interim Policy for Safe Demonstrations.

83.     The new policy introduced a three-strike rule: a student's first two violations will result in warnings, while the third will lead to a hearing before the University Judicial Board, which could result in punishments ranging from conditional disciplinary probation to expulsion. Those rulings can be appealed. *See Interim University Policy for Safe Demonstrations*, Columbia University, available at https://universitypolicies.columbia.edu/content/interim-university-policy-safe-demonstrations.

84.     In light of the new policy, Plaintiff emailed the Office of Student Conduct on March 7, 2024 requesting that the new policy be applied in the University's investigation against him. The Office of Student Conduct denied Plaintiff's request.

85.     On March 13, 2024, Plaintiff received a Decision Letter which found him responsible for (i) disruptive behavior; (ii) endangerment; and (iii) harassment.

86.     Plaintiff was sanctioned to: (i) suspension from the University through May 31, 2025; (ii) disciplinary probation for one year following re-enrollment; and (iii) a reflection paper with a formal request to return to Columbia following the completion of the suspension.

87.     On March 22, 2024, Plaintiff timely submitted an appeal of the Decision and Sanction, citing (i) numerous procedural violations, including the University's withholding of relevant video evidence until the day of the hearing; (ii) new evidence, including the Committee's letter to Columbia University and its investigation into Columbia's handling of acts of antisemitism; and (iii) the sanction was disproportionate to the violations alleged.

88.     On April 8, 2024, the 11th business day since Plaintiff had submitted his appeal, Dean Andrande emailed Plaintiff, stating that Carlos Alonso ("Alonso"), Dean of the Graduate

School of Arts and Vice President for Graduate Education, would need additional time to consider Plaintiff's appeal, and would have a decision by April 11th.

89.     On April 9, 2024, Alonso denied Plaintiff's appeal in its entirety.

## II.     AGREEMENTS, REPRESENTATIONS, COVENANTS & WARRANTIES BETWEEN PLAINTIFF AND DEFENDANT COLUMBIA UNIVERSITY

90.     Columbia University could have easily addressed the hostile environment for Jewish and Israeli students on campus simply by properly and fairly enforcing its own Policies.

91.     Indeed, Columbia has several policies that promise to protect students, including Plaintiff, from harassment, discrimination, and the fear of violence, including, but not limited to, its: (i) University Standards and Discipline (the "Standards and Discipline Policy"); (ii) Interim University Policy for Safe Demonstrations (the "Interim Demonstrations Policy"); and (iii) Equal Opportunity and Affirmative Action Policies & Procedures (the "EOAA Policy") (collectively referred to as the "Policies").

92.     These Policies are publicly available on the website.

93.     On information and belief, the Policies are updated and/or reviewed each new school year.

94.     The Policies represent a contract between students and the University, and in particular, between Plaintiff and Defendant Columbia.

95.     Despite knowledge of the antisemitic, anti-Israel activities on campus through, *inter alia*, student and faculty complaints, postings around the school, media articles, and student postings on social media, Columbia has failed to enforce its Policies to protect Plaintiff and other Jewish and/or Israeli students from the antisemitic conduct described above.

96.     Columbia's failure to enforce the Policies before, during, and after Plaintiff's student conduct process has resulted in continued harassment of and discrimination against

Plaintiff and other Jewish and/or Israeli students, and has created a hostile environment which deprives said students from educational opportunities at Columbia University.

        **a.  The EOAA Policy**

97.     The Equal Opportunity and Affirmative Action Policies & Procedures states:

Columbia University is committed to providing a learning, living, and working environment free from discrimination and harassment and to fostering a nurturing and vibrant community founded upon the fundamental dignity and worth of all of its members. Each individual has the right to work and learn in a professional atmosphere that promotes equal employment opportunities and prohibits discrimination and harassment. All employees, applicants for employment, students, interns (paid or unpaid), contractors and people conducting business with the University are protected from prohibited conduct.

98.     The EOAA Policy further states:

The Office of Equal Opportunity and Affirmative Action Policies and Procedures ('EOAA Policies & Procedures') are designed to establish a non-discriminatory work and educational environment and to meet relevant legal requirements, including: Titles VI and VII of the Civil Rights Act of 1964; Title IX of the Education Amendments Act of 1972; relevant sections of the Violence Against Women Reauthorization Act; the Americans with Disabilities Act of 1990, Section 504 of the Rehabilitation Act of 1973, the Age Discrimination in Employment Act of 1967, New York State Education and Human Rights Laws, and New York City laws that prohibit discrimination on the basis of certain enumerated categories.

99.     The EOAA Policy defines discrimination as: "Treating members of a protected class less favorably because of their membership in that class or having a neutral policy or practice that adversely impacts the members of one protected class more than others."

100.     The EOAA Policy defines harassment as:

Subjecting an individual to unwelcome conduct, whether verbal or physical, that creates an intimidating, hostile, or abusive working, learning or campus living environment; that alters the conditions of employment or education; or unreasonably interferes with an individual's work or academic performance on the basis of the individual's membership in a protected class.

101.     As set forth herein, Columbia University breached its EOAA Policy by permitting discrimination and harassment of Jewish and/or Israeli students, including Plaintiff, in violation of

Title VI, and by failing to enforce any Policy violation against the pro-Palestine protestors. Further, as set forth herein, Columbia engaged in disparate treatment of Plaintiff by treating him, as a Jewish student, differently from similarly situated students, and harshly enforcing alleged Policy violations against Plaintiff, while not doing so for the students that engaged in pro-Palestine rallies in violation of the University's Policies.

### b.  The Standards and Discipline Policy

102.    The Standards and Discipline Policy defines disruptive behavior as: "behavior that interferes with the academic mission of the University or compromises the well-being of the University community."

103.    The Standards and Discipline Policy defines endangerment as: "Knowingly and/or recklessly endangering the health or safety of others."

104.    The Standards and Discipline Policy defines harassment as: "repeated unwelcome verbal or physical conduct/threat of physical conduct that, because of its severity, or persistence, interferes significantly with or adversely affects an individual's work, education, or living conditions."

105.    Regarding interim discipline, the Standards and Discipline Policy states:

In certain circumstances during the investigative process, SC or other University administrators may place restrictions on a student prior to the conclusion of the Dean's Discipline process. Restrictions that may be placed on a student may include: restricting contact with another individual or people; restricting access to the residence halls or other buildings on campus; suspending a student from participation in classes or events and/or organizations within the campus community. These interim actions will only be taken if it is determined that the student's behavior may make their presence on campus a danger to the normal operations of the institution, the safety of themselves, others, or to the property of the University or others.

106.    The Standards and Discipline Policy states: "Dates and times for disciplinary hearings are scheduled by SC in consultation with the student's academic schedule to avoid

conflict. The student is also informed of the next steps in the process and their ability to review the relevant documentation prior to the hearing."

107.    The Standards and Discipline Policy states: "The standard of proof used to determine outcomes is the "preponderance of the evidence" standard. This standard allows for a finding of responsibility if, at the conclusion of the investigation, the information suggests it is more likely than not that a violation occurred."

108.    The Standards and Discipline Policy states that:

> In determining a sanction, the Hearing Officers will impose sanctions that are: (i) Fair and appropriate, given the facts of the particular case; (ii) Generally consistent with the University's handling of similar cases; (iii) Adequate to protect the safety of the campus community and/or the integrity of the academic environment; and (iv) Reflective of the seriousness of prohibited conduct.

109.    The Standards and Discipline Policy states: "Regardless of the outcome of the appeal, the student will receive the Appellate Officer's final decision in writing within 10 business days of receipt of request or at their earliest convenience."

110.    As set forth herein. Columbia breached its Standards and Discipline Policy by: (i) improperly finding Plaintiff responsible for disruptive behavior, endangerment, and harassment, against the weight of evidence; (ii) failing to allow Plaintiff to review all available evidence prior to the hearing; (iii) failing to timely consider Plaintiff's appeal, and failing to provide a reason for any extension; (iv) failing to implement a sanction commensurate with the alleged policy violations; and (v) failing to enforce the Standards and Discipline Policy with regard to students engaging in unsanctioned rallies and/or antisemitic acts, including the publishing of "FBI wanted" posters with Plaintiff's photograph.

### c.  The Interim Demonstrations Policy

111.    The Interim Demonstration Policy states:

The right of students, faculty, and staff to express their views is the cornerstone of our academic community. We are committed to free and open debate, and the principle that the right to speak applies equally to everyone, regardless of their viewpoint. Just as every member of our community has this right, they also have a corresponding responsibility not to interfere with the rights of others to speak, study, teach, and learn. Consistent with the Rules of University Conduct (the 'Rules'), the University is committed to ensuring that all members of the University community have the right to speak, study, research, teach, and express their own views.

112.    The Interim Demonstration Policy further states:

Violations by individual students will be reported to the Center for Student Success and Intervention (CSSI) as directed in the University's Standards and Discipline Policy. CSSI will review the report and issue the appropriate notice per the below. A student may not receive more than one warning under this Policy in connection with a single demonstration. The following recommended sanctions will apply to violations of this Policy: First violation – written warning to the student. Second violation - warning letter to the student that goes on the student's record but gets removed at the end of the semester if no further violations. Three or more violations - will go to the University Judicial Board (UJB) for hearing with recommended actions: conditional disciplinary probation, disciplinary probation, suspension, or expulsion.

113.    Columbia breached the Interim Demonstration Policy by failing to afford Plaintiff the same freedom of expression as the pro-Palestine protestors, and instead, sanctioning Plaintiff for his pro-Israel, anti-hate expression. Further, Columbia breached the Interim Demonstration Policy by failing to apply this policy to the allegations against Plaintiff, and instead using the old policy in order to implement a harsh sanction against Plaintiff.

III.    **PLAINTIFF'S DAMAGES**

114.    As a direct and proximate result of Defendant's biased, unlawful, and improper conduct, Plaintiff was wrongly found responsible for partaking in disruptive behavior,

endangerment, and harassment, and such a finding has been made part of Plaintiff's educational records. Further, Plaintiff's expected graduation date has been severely delayed.

115.     These notations will forever mar Plaintiff's records, especially in the wake of the contentious, horrific Hamas attack on innocent Israeli civilians on October 7, 2023.

116.     Due to Defendant's biased, unlawful, and improper conduct, Plaintiff was subjected to an unfair, biased, improper investigation and adjudication which destroyed Plaintiff's reputation and will permanently impact and derail his future.

117.     Due to Defendant's biased, unlawful, improper conduct, Plaintiff has been falsely labeled as a perpetrator of a hate crime.

118.     Due to Defendant's biased, unlawful, and improper conduct, Plaintiff's academic file is now marred by an improper and baseless finding of violence, which will forever be noted on Plaintiff's transcript.

119.     Due to Defendant's biased, unlawful, improper conduct, Plaintiff has suffered and will continue to suffer ridicule, reputational damage, economic losses, and damages to his future educational and career prospects.

120.     Due to Defendant's biased, unlawful, improper conduct, Plaintiff has been subjected to further harassment and a hostile environment, which is so severe and pervasive so as to deny Plaintiff educational opportunities.

### AS AND FOR A FIRST CAUSE OF ACTION
**Violation of Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d *et seq.***

121.     Plaintiff repeats and re-alleges each and every allegation above as if fully set forth herein.

122.     Title VI of the Civil Rights Act of 1964 (Title VI) prohibits discrimination on the basis of race, color, or national origin. National origin discrimination includes discrimination

against those who identify as or are perceived to be Jewish as well as those who identify with Israel as their ancestral homeland.

123.    The U.S. Department of Education Office of Civil Rights ("OCR") has confirmed that "Title VI protects all students, including students who are or are perceived to be Jewish, from discrimination based on race, color, or national origin." Consistent with this interpretation, the OCR has demanded that federally funded schools "take immediate and appropriate action to respond to harassment that creates a hostile environment."

124.    "The U.S. National Strategy to Counter Antisemitism" that President Biden issued likewise directed the OCR to remind schools of "their legal obligation under Title VI of the Civil Rights Act of 1964 to address complaints of discrimination, including harassment based on race, color, or national origin, including shared ancestry, such as Jewish ancestry, and ethnic characteristics." *See The U.S. National Strategy to Counter Antisemitism,* The White House (May 2023), available at [https://www.whitehouse.gov/wp-content/uploads/2023/05/U.S.-National-Strategy-to-Counter-Antisemitism.pdf](https://www.whitehouse.gov/wp-content/uploads/2023/05/U.S.-National-Strategy-to-Counter-Antisemitism.pdf).

125.    On December 9, 2023, New York Governor Kathy Hochul issued a letter to the Presidents of Universities in New York, stating:

> [F]ailure to address such activity would constitute a violation of New York State Human Rights Law as well as Title VI of the Civil Rights Act of 1964. Under Title VI, any recipient of federal funds is responsible for keeping students free from a hostile environment based upon their ethnicity or national origin - a standard that that has been applied to antisemitism . . . . I assure you that if any school in New York State is found to be in violation, I will activate the State's Division of Human Rights to take aggressive enforcement action and will refer possible Title VI violations to the federal government.

*See Letter from New York Governor Kathy Hochul to New York State Coll. and Univ. Presidents (Dec. 9,2023),* available at [https://www.governor.ny.gov/sites/default/files/2023-12/SchoolsV2.pdf](https://www.governor.ny.gov/sites/default/files/2023-12/SchoolsV2.pdf).

126.   Columbia University receives federal financial assistance and is subject to the requirements of Title VI.

127.   Plaintiff is a Jewish and Israeli student, and his affinity with Israel is part of his identity.

128.   Columbia's intentional discrimination against Plaintiff created a hostile environment for Plaintiff as a Jewish/Israeli student by immediately branding Plaintiff as a dangerous criminal before collecting relevant evidence, subjecting Plaintiff to public threats and ridicule which put Plaintiff's safety in danger. Furthermore, in not responding to the doxing of Plaintiff (a Jewish Hispanic American) by Columbia students, Columbia showed a clear indifference to Plaintiff, despite the University's Policies.

129.   Columbia intentionally discriminated against Plaintiff as a Jewish/Israeli student by subjecting Plaintiff to discipline for expressing his discontent with the pro-Hamas pro-Palestine message at the January 19 rally, while not sanctioning *one single student* involved with the organization of the unsanctioned rally—which included genocidal chants and called for the total destruction of an entire legal state.

130.   Columbia's deliberate indifference created a hostile environment for Plaintiff as a Jewish/Israeli student, in violation of Title VI. Columbia's deliberate indifference further deprived Plaintiff of the full benefit of educational opportunities at the University based on his national origin—a Jewish student who identifies with Israel.

131.   Columbia acted with deliberate indifference when it ignored months of antisemitic acts on campus following the October 7 attack on Israel. Columbia's failure to take action against these acts led to the implicit approval of the antisemitic rally held on January 19, and the safety threats which Plaintiff received and Columbia failed to take action against.

132.    Columbia had actual notice of severe and pervasive harassment against Jewish students on campus. Columbia possessed enough knowledge of the harassment that it reasonably should have implemented deterrence measures before, and on the day of, the January 19 rally and in its aftermath in response to flagrant violations of University Policies and threats to Plaintiff's safety.

133.    The harassment of Plaintiff, and bias against Plaintiff, by the University choosing to *only* sanction Plaintiff and none of the other organizers or attendees of the unsanctioned rally, is so severe and pervasive, causing Plaintiff to, *inter alia*, move out of his apartment, miss classes, seek counseling support, and avoid campus buildings and premises, for fear of his safety on campus.

134.    Columbia's deliberate indifference to the harassment against Jewish and/or Israeli students is pervasive. Columbia did not implement any deterrence after being on notice of potentially dangerous conditions on campus, nor did it take sufficient measures to resolve the harassment and discrimination against Plaintiff. Instead, Columbia's actions in sanctioning Plaintiff were the direct result of the implicit and explicit bias held by Columbia and its administration against Jewish and/or Israeli students. By way of example, and not limitation:

    i.    Prior to the January 19 rally, Columbia did not take action to prevent acts of antisemitism on campus, in blatant violation of University Policies. On information and belief, Columbia did not timely investigate *or take interim action* against violators of the School's EOAA Policy and/or Standards and Discipline Policy to deter further acts of antisemitism or otherwise denounce the conduct. In contrast, the University took swift action to investigate, interim suspend, and sanction Plaintiff for expressing his views against a pro-Palestine rally which called for violence against Israel, through the use of a harmless gag gift bought on Amazon.

    ii.    Prior to the January 19 rally, Columbia was well aware that SJP and JVP were holding unsanctioned Pro-Palestine demonstrations on campus, in direct violation of University Policies. In response, instead of disciplining the organizers of these unsanctioned rallies, the University released a new Interim

Demonstration Policy, which offered *even more lenience* for the organizers of unsanctioned rallies—calling only for a "warning" for the first two violations. In contrast, Plaintiff, from merely using an Amazon spray to express his views, was treated as a criminal and sanctioned to suspension from the University.

iii.   On information and belief, since the October 7 attack, Columbia did nothing to condemn or disperse the unsanctioned rallies held on campus, where protestors chanted antisemitic, anti-Israel, violent, genocidal threats at and about Jewish and/or Israeli students, including Plaintiff. Instead, Columbia merely affirmed the students' freedom of expression. In contrast, when Plaintiff exercised his freedom of expression in support of Israel, he was treated as a criminal.

iv.   On information and belief, Columbia has not taken any disciplinary action against the organizers of the January 19 anti-Israel rally. Columbia's deliberate indifference has fostered an increasingly pervasive hostile educational environment for its pro-Israel students, including Plaintiff.

v.   Through its continued deliberate indifference before, during, and after the October 7 attack on Israel, Columbia has facilitated further antisemitism and anti-Israel harassment of Jewish and/or Israeli students, including Plaintiff, by, *inter alia*, promoting and/or not condemning antisemitic, anti-Israel actions and speech on campus, as well as not taking sufficient action to deter or prevent such harassment.

135.   Columbia's ongoing disparate treatment of Plaintiff on the basis of national origin has contributed to a hostile environment on campus that has injured Plaintiff and left Plaintiff vulnerable to further harassment, such as the biased disciplinary proceedings which Plaintiff was forced to undergo.

136.   As a direct and proximate result of Columbia's actions and inactions in violation of Title VI, Plaintiff has sustained substantial injury, damage, and loss, including, but not limited to: emotional distress, psychological damages, loss of education, loss of future educational and career opportunities, reputational damages, economic injuries and other direct and consequential damages.

137.   Accordingly, Plaintiff is entitled to all relief available under Title VI, including damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees,

expenses, costs and disbursements, as well as injunctive relief directing Columbia to: (i) reverse the outcome, findings, and sanction described hereinabove; (ii) expunge Plaintiff's disciplinary record with respect to the allegations described hereinabove; (iii) remove any record of the finding and/or Plaintiff's suspension from his educational file/disciplinary records/transcript; (iv) issue an update/correction to any third parties to whom Plaintiff's disciplinary record may have been disclosed; and (v) any and all further actions required to return Plaintiff to the status quo ante.

## AS AND FOR A SECOND CAUSE OF ACTION
### Violation of New York Executive Law § 296 *et seq.*

138.    Plaintiff repeats and re-alleges each and every allegation above as if fully set forth herein.

139.    Plaintiff is entitled to an educational environment that is free from harassment and discrimination. The New York State Human Rights Law ("NYSHRL") prohibits an educational institution from permitting the harassment of any student on the basis of the student's actual or perceived religion or national origin.

140.    Plaintiff identifies as Jewish, and identifies Israel as his national and ancestral homeland, which is intrinsic to his identity. Plaintiff is protected by the NYSHRL.

141.    Columbia's actions, inactions, negligence, and/or deliberate indifference to the antisemitic, anti-Israel harassment of Plaintiff on the basis of his religion and national origin has violated the protections owed to Plaintiff under the NYSHRL. Columbia's actions, inactions, negligence, and/or deliberate indifference have permitted the harassment of Plaintiff to continue on campus.

142.    Columbia has failed to take deterrence measures to protect Plaintiff, and other Jewish and/or Israeli students, against harassment on campus.

143.    Columbia has not taken any measures to remediate the harassment and discrimination; it has failed to conduct timely investigations into the harassing conduct and has failed to discipline those responsible for the harassment. In contrast, Columbia has used all available remedies to swiftly take action against Plaintiff, for expressing his pro-Israel views.

144.    Columbia's actions, inactions, negligence, and/or deliberate indifference have facilitated the ongoing harassment of Plaintiff and other Jewish and/or Israeli students in violation of Columbia's statutory obligations under the NYSHRL.

145.    Columbia's violations have deprived Plaintiff of the full benefits and use of Columbia's educational programs and facilities. Plaintiff has been denied the use of campus spaces on the basis of his religion and national origin out of fear for his safety, and, in particular, due to the suspension implemented by Columbia against Plaintiff due to Plaintiff's expression of his pro-Israel views.

146.    As a direct and proximate result of Columbia's actions and inactions in violation of the NYSHRL, Plaintiff has sustained substantial injury, damage, and loss, including, but not limited to: emotional distress, psychological damages, loss of education, loss of future educational and career opportunities, reputational damages, economic injuries and other direct and consequential damages.

147.    Accordingly, Plaintiff is entitled to all relief available under the NYSHRL, including damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements, as well as injunctive relief directing Columbia to: (i) reverse the outcome, findings, and sanction described hereinabove; (ii) expunge Plaintiff's disciplinary record with respect to the allegations described hereinabove; (iii) remove any record of the finding and/or Plaintiff's suspension from his educational file/disciplinary

records/transcript; (iv) issue an update/correction to any third parties to whom Plaintiff's disciplinary record may have been disclosed; and (v) any and all further actions required to return Plaintiff to the status quo ante.

**AS AND FOR A THIRD CAUSE OF ACTION**
**Violation of New York Civil Rights Law § 40, *et seq.***

148.    Plaintiff repeats and re-alleges each and every allegation above as if fully set forth herein.

149.    New York Civil Rights law entitles all persons to be protected from discrimination on the basis of national origin in any of their civil rights by any other person, corporation, or institution, or by the state.

150.    N.Y. Exec. Law § 291 recognizes the "opportunity to obtain education" and "the use of places of public accommodation" "without discrimination because of … national origin" as civil rights.

151.    Columbia is a place of public accommodation by operation of N.Y. Civ. Rights Law § 40.

152.    Columbia has violated Plaintiff's civil rights by subjecting Plaintiff to on-campus discrimination on the basis of his identity as a Jewish student who identifies Israel as his national and ancestral homeland. Columbia's actions, inactions, negligence, and/or deliberate indifference to the hostile campus environment and its failure to protect Plaintiff from discrimination and harassment through its ineffective deterrence and inadequate remedial measures have harmed Plaintiff's opportunities to obtain education and unencumbered use of all campus facilities.

153.    As a direct and proximate result of Columbia's actions and inactions in violation of the NY Civil Rights Law, Plaintiff has sustained substantial injury, damage, and loss, including, but not limited to: emotional distress, psychological damages, loss of education, loss of future

educational and career opportunities, reputational damages, economic injuries and other direct and consequential damages.

154.    Accordingly, Plaintiff is entitled to all relief available under the NY Civil Rights Law, including damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements, as well as injunctive relief directing Columbia to: (i) reverse the outcome, findings, and sanction described hereinabove; (ii) expunge Plaintiff's disciplinary record with respect to the allegations described hereinabove; (iii) remove any record of the finding and/or Plaintiff's suspension from his educational file/disciplinary records/transcript; (iv) issue an update/correction to any third parties to whom Plaintiff's disciplinary record may have been disclosed; and (v) any and all further actions required to return Plaintiff to the status quo ante.

155.    Per N.Y. Civ. Rights Law § 40-d, Plaintiff will serve notice of this complaint upon the New York State Attorney General.

### AS AND FOR A FOURTH CAUSE OF ACTION
**Violation of N.Y.C. Admin. Code § 8-107**

156.    Plaintiff repeats and re-alleges each and every allegation above as if fully set forth herein.

157.    The New York City Human Rights Law ("NYCHRL") prohibits an agent or employee of any place or provider of public accommodation from directly or indirectly refusing, withholding from, or denying any person the full and equal enjoyment, on equal terms and conditions, of any of the accommodations, advantages, services, facilities, or privileges of the place or provider of public accommodation because of such person's actual or perceived national origin.

158.    Columbia's actions, inactions, negligence, and/or deliberate indifference in violation of the NYCHRL have been the actual, direct, and proximate causes of Plaintiff's injuries.

159.    As a direct and proximate result of Columbia's actions and inactions in violation of N.Y.C. Admin. Code § 8-107, Plaintiff has sustained substantial injury, damage, and loss, including, but not limited to: emotional distress, psychological damages, loss of education, loss of future educational and career opportunities, reputational damages, economic injuries and other direct and consequential damages.

160.    Accordingly, Plaintiff is entitled to all relief available under N.Y.C. Admin. Code § 8-107, including damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements, as well as injunctive relief directing Columbia to: (i) reverse the outcome, findings, and sanction described hereinabove; (ii) expunge Plaintiff's disciplinary record with respect to the allegations described hereinabove; (iii) remove any record of the finding and/or Plaintiff's suspension from his educational file/disciplinary records/transcript; (iv) issue an update/correction to any third parties to whom Plaintiff's disciplinary record may have been disclosed; and (v) any and all further actions required to return Plaintiff to the status quo ante.

161.    Per NYCHRL § 8-502, Plaintiff will serve notice of this complaint upon the City Commission on Human Rights and the Corporation Counsel.

**AS AND FOR A FIFTH CAUSE OF ACTION**
**Breach of Contract**

162.    Plaintiff repeats and re-alleges each and every allegation above as if fully set forth herein.

163.    At all relevant times hereto, a contractual relationship existed between Columbia and Plaintiff by virtue of Plaintiff's enrollment at Columbia and as defined by and through Columbia's Policies and procedures governing the student disciplinary system.

164.    Through the documents it publishes and provides to students, Columbia makes express and implied contractual commitments to students involved in the disciplinary process and/or the investigation of potential violations of Policies.

165.    New York law recognizes that the relationship between a student and a college is contractual in nature, and that the terms of the college's policies and student handbook become part of that contract.

166.    Implied in every contract is the covenant of good faith and fair dealing.

167.    Based on the aforementioned facts and circumstances, Columbia created express and implied contracts when it offered, and Plaintiff accepted, admission to Columbia, and when Plaintiff paid the required tuition and fees.

168.    Plaintiff has complied with his contractual obligations.

169.    Columbia, however, has breached its contractual obligations to Plaintiff.

170.    As detailed above, Columbia breached its contractual promises with respect to the safety, well-being, and fair treatment of its student population. Columbia's Policies include specific and concrete promises to maintain a campus that is free and clear of harassment, including, but not limited to:

     i.    **The EOAA Policy.** The EOAA Policy states: "Columbia University is committed to providing a learning, living, and working environment free from discrimination and harassment and to fostering a nurturing and vibrant community founded upon the fundamental dignity and worth of all of its members. Each individual has the right to work and learn in a professional atmosphere that promotes equal employment opportunities and prohibits discrimination and harassment. All employees, applicants for employment, students, interns (paid or unpaid), contractors and people conducting business

with the University are protected from prohibited conduct." The EOAA Policy further states: "The Office of Equal Opportunity and Affirmative Action Policies and Procedures ("EOAA Policies & Procedures") are designed to establish a non-discriminatory work and educational environment and to meet relevant legal requirements, including: Titles VI and VII of the Civil Rights Act of 1964; Title IX of the Education Amendments Act of 1972; relevant sections of the Violence Against Women Reauthorization Act; the Americans with Disabilities Act of 1990, Section 504 of the Rehabilitation Act of 1973, the Age Discrimination in Employment Act of 1967, New York State Education and Human Rights Laws, and New York City laws that prohibit discrimination on the basis of certain enumerated categories." The EOAA Policy defines discrimination as: "Treating members of a protected class less favorably because of their membership in that class or having a neutral policy or practice that adversely impacts the members of one protected class more than others," and defines harassment as "Subjecting an individual to unwelcome conduct, whether verbal or physical, that creates an intimidating, hostile, or abusive working, learning or campus living environment; that alters the conditions of employment or education; or unreasonably interferes with an individual's work or academic performance on the basis of the individual's membership in a protected class."

ii. **The Standards and Discipline Policy.** The Standards and Discipline Policy governs the student discipline process and defines "disruptive behavior" as: "behavior that interferes with the academic mission of the University or compromises the well-being of the University community"; "endangerment" as: "Knowingly and/or recklessly endangering the health or safety of others"; and "harassment" as: "repeated unwelcome verbal or physical conduct/threat of physical conduct that, because of its severity, or persistence, interferes significantly with or adversely affects an individual's work, education, or living conditions." Regarding interim discipline, the Standards and Discipline Policy states: "interim actions will only be taken if it is determined that the student's behavior may make their presence on campus a danger to the normal operations of the institution, the safety of themselves, others, or to the property of the University or others." Prior to setting a student conduct hearing, the Policy mandates that the student have "the ability to review the relevant documentation prior to the hearing." In reaching a finding of responsibility, the "preponderance of the evidence" standard is to be used. The Standards and Discipline Policy states that: "In determining a sanction, the Hearing Officers will impose sanctions that are: (i) Fair and appropriate, given the facts of the particular case; (ii) Generally consistent with the University's handling of similar cases; (iii) Adequate to protect the safety of the campus community and/or the integrity of the academic environment; and (iv) Reflective of the seriousness of prohibited conduct." Further, "Regardless of the outcome of the appeal, the student will receive the Appellate Officer's final decision in writing within 10 business days of receipt of request or at their earliest convenience."

iii. **The Interim Demonstrations Policy.** The Interim Demonstrations Policy states "The right of students, faculty, and staff to express their views is the cornerstone of our academic community. We are committed to free and open debate, and the principle that the right to speak applies equally to everyone, regardless of their viewpoint. Just as every member of our community has this right, they also have a corresponding responsibility not to interfere with the rights of others to speak, study, teach, and learn. Consistent with the Rules of University Conduct (the 'Rules'), the University is committed to ensuring that all members of the University community have the right to speak, study, research, teach, and express their own views." The Policy goes on to outline: "Violations by individual students will be reported to the Center for Student Success and Intervention (CSSI) as directed in the University's Standards and Discipline Policy. CSSI will review the report and issue the appropriate notice per the below. A student may not receive more than one warning under this Policy in connection with a single demonstration. The following recommended sanctions will apply to violations of this Policy: First violation – written warning to the student. Second violation - warning letter to the student that goes on the student's record but gets removed at the end of the semester if no further violations. Three or more violations - will go to the University Judicial Board (UJB) for hearing with recommended actions: conditional disciplinary probation, disciplinary probation, suspension, or expulsion."

171.    Columbia University breached its express and implied contracts with Plaintiff by failing to enforce the commitments reflected in its Policies to provide Plaintiff a campus free from discrimination and harassment.

172.    On and before the January 19, 2024 rally, Columbia breached its contractual obligations to Plaintiff by failing to take action against the organizers and attendees of an unauthorized, anti-Israel rally, which encouraged violence and chanted genocidal slogans.

173.    Columbia further breached its contractual obligations to Plaintiff by failing to afford him the same freedom of expression as granted to the students who partook in the unauthorized rally. Indeed, when Plaintiff exercised his freedom of expression using a gag gift, his actions were immediately denounced, and he was portrayed as a criminal. In contrast, neither the

students involved in the rally, nor the students who have doxed Plaintiff and have continued to fundraise by portraying Plaintiff's actions as a hate crime, have not been sanctioned.

174.    Columbia breached its contractual obligations to Plaintiff to provide a campus free from discrimination by treating Plaintiff, a Jewish, Israeli student, differently from others on campus—Plaintiff was subjected to a swift disciplinary process and a sanction of suspension, while students who expressed their pro-Palestine views were not sanctioned by the University in any manner.

175.    Columbia breached its contractual obligations to Plaintiff by failing to remedy the harassment Plaintiff was experiencing on campus, including students posting fake "FBI wanted" posters with his photograph. Columbia's failure to take action against this harassment put Plaintiff's safety in grave danger.

176.    Throughout the investigation and adjudication of the allegations against Plaintiff, the University breached its contractual obligations to Plaintiff by: (i) failing to allow Plaintiff to review all available evidence, including video evidence, prior to the hearing; (ii) failing to timely address Plaintiff's appeal, and failing to provide a valid reason for the extension; (iii) failing to properly apply the preponderance of the evidence standard because, among other things, there was no evidence that students needed medical treatment *due to* Plaintiff's use of a gag gift spray; and (iv) failing to properly consider relevant factors when implementing Plaintiff's interim suspension and sanction, including his spotless disciplinary record up until the events described herein.

177.    The University further breached its contractual obligations to Plaintiff by failing to apply the Interim Demonstrations Policy, even though the new policy fit squarely with the allegations against Plaintiff, and therefore, Plaintiff should have only been issued a warning. Indeed, the University exhibited disparate treatment by refusing to apply this new, more lenient

policy in Plaintiff's case, but using the Policy with regard to the unauthorized pro-Palestine rally organizers.

178.    Columbia has also breached the implied covenant of good faith and fair dealing through its failure to enforce its Policies in a fair, unbiased manner.

179.    As a proximate and foreseeable consequence of the foregoing breaches, Plaintiff sustained damages, including, but not limited to, emotional distress, psychological damages, loss of education, loss of future educational and career opportunities, reputational damages, economic injuries, and other direct and consequential damages.

180.    As a result of the foregoing, Plaintiff is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs, and disbursements.

## PRAYER FOR RELIEF

**WHEREFORE,** for the foregoing reasons, Plaintiff demands judgment against Defendant Columbia University as follows:

    i.    On the first cause of action for Violation of Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d *et seq.*, a judgment awarding Plaintiff damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements, as well as injunctive relief directing Columbia to: (i) reverse the outcome, findings, and sanction described hereinabove; (ii) expunge Plaintiff's disciplinary record with respect to the allegations described hereinabove; (iii) remove any record of the finding and/or Plaintiff's suspension from his educational file/disciplinary records/transcript; (iv) issue an update/correction to any third parties to whom Plaintiff's disciplinary record may have been disclosed; and (v) any and all further actions required to return Plaintiff to the status quo ante.

    ii.    On the second cause of action for Violation of New York Executive Law § 296 *et seq.*, a judgment awarding Plaintiff damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements, as well as injunctive relief directing Columbia to: (i) reverse the outcome, findings, and sanction described hereinabove; (ii) expunge Plaintiff's disciplinary record with respect to the allegations described hereinabove; (iii) remove any record of the finding and/or Plaintiff's suspension from his educational file/disciplinary records/transcript; (iv) issue an update/correction

to any third parties to whom Plaintiff's disciplinary record may have been disclosed; and (v) any and all further actions required to return Plaintiff to the status quo ante.

iii.   On the third cause of action for Violation of New York Civil Rights Law § 40, *et seq.*, a judgment awarding Plaintiff damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements, as well as injunctive relief directing Columbia to: (i) reverse the outcome, findings, and sanction described hereinabove; (ii) expunge Plaintiff's disciplinary record with respect to the allegations described hereinabove; (iii) remove any record of the finding and/or Plaintiff's suspension from his educational file/disciplinary records/transcript; (iv) issue an update/correction to any third parties to whom Plaintiff's disciplinary record may have been disclosed; and (v) any and all further actions required to return Plaintiff to the status quo ante.

iv.   On the fourth cause of action for Violation of N.Y.C. Admin. Code § 8-107, a judgment awarding Plaintiff damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements, as well as injunctive relief directing Columbia to: (i) reverse the outcome, findings, and sanction described hereinabove; (ii) expunge Plaintiff's disciplinary record with respect to the allegations described hereinabove; (iii) remove any record of the finding and/or Plaintiff's suspension from his educational file/disciplinary records/transcript; (iv) issue an update/correction to any third parties to whom Plaintiff's disciplinary record may have been disclosed; and (v) any and all further actions required to return Plaintiff to the status quo ante

v.   On the fifth cause for breach of contract, a judgment awarding Plaintiff damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements; and

vi.   Such other and further relief as the Court deems just and proper.

## **JURY DEMAND**

Plaintiff herein demands a trial by jury of all triable issues in the present matter.


**Dated:   New York, New York**
**April 16, 2024**

                    **Respectfully submitted,**

                    **NESENOFF & MILTENBERG, LLP**
                    *Attorneys for Plaintiff*

By: **/s/ Andrew T. Miltenberg**
**Andrew T. Miltenberg, Esq.**
**Stuart Bernstein, Esq.**
**Kristen Mohr, Esq.**
**363 Seventh Avenue, Fifth Floor**
**New York, New York 10001**
**(212) 736-4500**
amiltenberg@nmllplaw.com
sbernstein@nmllplaw.com
kmohr@nmllplaw.com


**LAW OFFICES OF JEFFREY LICHTMAN**
*Attorney for Plaintiff*

**Jeffrey Lichtman, Esq.**
**441 Lexington Avenue, Suite 504**
**New York, New York 10017**
**(212) 581-1001**
jhl@jeffreylichtman.com